**Wallace E. DAY et al.**

v.

**PATAPSCO & BACK RIVERS RAILROAD COMPANY et al.**

Civ. No. Y–76–1484.

United States District Court, D. Maryland.

Jan. 15, 1981.

Kenneth L. Johnson, Anthony W. Robinson, Baltimore, Md., and Dorothy R. Fait, Silver Spring, Md., for plaintiffs.

Douglas D. Connah, Jr., G. Stewart Webb, Jr., Thomas E. Lynch, III, Baltimore, Md., for defendant Patapsco and Back Rivers R. Co.

Jeffrey L. Gibbs, Mady Gilson, Washington, D. C., and I. Duke Avnet, Baltimore, Md., for defendant Unions.

JOSEPH H. YOUNG, District Judge.

## MEMORANDUM OPINION AND ORDER

Plaintiffs,[1] present or past employees of defendant Patapsco & Back Rivers Railroad Company [Patapsco], and present or past members of defendant United Steelworkers of America [Steelworkers] through defendant Local 2819 or defendant Local 5054, seek legal and equitable relief on account of numerous alleged violations of 42 U.S.C. § 1981 and 42 U.S.C. § 2000e *et seq.* (Title VII). All of the plaintiffs are black. At a pre-trial conference on November 10, 1980, many of plaintiffs' claims were either dismissed or voluntarily abandoned, primarily on limitations grounds. Part One of this Opinion will deal with the actions taken at this pre-trial conference. The remaining claims proceeded to trial in early December; Part Two of this Opinion resolves those remaining claims.

By way of introduction, the Patapsco & Back Rivers Railroad Company is one of six (6) common carrier railroads which are wholly-owned subsidiaries of the Bethlehem Steel Corporation. Patapsco's plant is divided into five separate departments: Maintenance-of-Way, Maintenance-of-Equipment, Locomotive, Clerical, and Transportation. Pursuant to a series of collective bargaining agreements entered into between Patapsco and Steelworkers, the first of which took effect in 1943 (Defendant Patapsco Exhibit # 66), a unit system of seniority has been in existence at Patapsco which governs promotions, demotions, layoffs, recalls, and transfers. Each department at Patapsco constitutes a separate seniority unit; indeed, certain departments contain more than one unit depending upon the number of crafts existing within the specific department. It is uncontroverted that this unit seniority system, on its face, applies equally to all races.

The six individual plaintiffs work, or worked, primarily as trackmen in the Maintenance-of-Way department. Since 1943, Maintenance-of-Way has been represented by Steelworkers Local 2819. The remaining

---

1. Class certification was denied by order of this Court (Thomsen, J.) dated June 8, 1977.

departments are represented by Steelworkers Local 5054. The racial composition of those departments represented by Local 5054 is predominantly white, whereas the Maintenance-of-Way department is primarily black. Evidence adduced at trial indicates that Maintenance-of-Way was entirely black until December, 1967.

*Part One: The November 10 Pre-Trial Conference*

On October 24, 1980, defendant Patapsco filed a Motion for Partial Summary Judgment which was considered at a pre-trial conference on November 10. Patapsco's Motion was premised upon two basic theories, limitations and exhaustion. Plaintiffs did not contest Patapsco's assertion that a three year statute of limitations applies to actions pursued under 42 U.S.C. § 1981, *see Linder v. Litton Systems, Inc.*, 81 F.R.D. 14, 17 (D.Md.1978); *Hoggs v. Bethlehem Steel Corp.*, Civil Action No. Y–77–1193, Memorandum and Order at 2 (D.Md. October 25, 1979); nor did they contest the settled principle that the limitations period under Title VII is either 180 or 300 days prior to the plaintiffs' initial filing of a discrimination complaint, depending upon whether the initial complaint was filed with a federal (180) or state (300) agency. 42 U.S.C. § 2000e–5(e); *United Air Lines v. Evans*, 431 U.S. 553, 558, 97 S.Ct. 1885, 1889, 52 L.Ed.2d 571 (1977). Plaintiffs did, however, argue that the doctrine of continuing discrimination operated to resurrect many otherwise untimely claims. Before discussing the individual claims, it is thus necessary to briefly review the continuing discrimination doctrine.

■ Simply put, the doctrine of continuing discrimination suggests that pre-limitations period acts may be sued upon at anytime, so long as the effects of those past discriminatory acts are being felt at the time of suit. The Supreme Court has gone far in recent years towards eliminating this doctrine. In *United Air Lines v. Evans, supra,* the Supreme Court expressly rejected a claim of continuing discrimination even though it was conceded that the plaintiff was suffering from present effects, saying:

the emphasis should not be placed on mere continuity; the critical question is whether any *present violation* exists.

*Id.* at 558, 97 S.Ct. at 1889. The Court went on to note that a past discriminatory act should, for legal purposes, be treated as "merely an unfortunate event in history which has no present legal consequences." *Id.* The reason for this narrow interpretation of the continuing discrimination doctrine is apparent—to construe too loosely "continuing discrimination" would undermine the theory underlying the statute of limitations. *Olson v. Rembrandt Printing Co.*, 511 F.2d 1228, 1234 (8th Cir. 1975) (*en banc*). These teachings guided this Court's actions at the November 10 pre-trial conference.

I. *Claims Against Defendant Patapsco*

At the pre-trial conference, each individual claim of each individual plaintiff was reviewed in light of the limitations principles mentioned above, with the following results:

a) *Plaintiff John A. Franklin*

*Complaint Filed:* October 1, 1976

*§ 1981 Limitations Date:* October 1, 1973

*EEOC Charges Filed:* June 1, 1976

*Title VII Limitations Date:* December 4, 1975 (180 days pre-EEOC)

■ Franklin alleged discrimination in four basic areas: (1) job assignments; (2) transfers; (3) seniority; (4) layoffs. The *job assignment* claim was comprised of three separate subclaims. First, Franklin complained that his initial assignment to the position of trackman was discriminatory. This assignment occurred in either 1954 or 1955; hence, the claim was dismissed as untimely. Second, Franklin complained that his assignment to an all-black work unit was discriminatory. This claim was abandoned, as plaintiff conceded that the Maintenance-of-Way department had been integrated since 1967. Third, Franklin complained that he received disparate pay for work which he performed as a Laborer in the Locomotive Department in 1971. This claim was also adjudged untimely and was similarly dismissed.

Both the *layoff* claim and the *transfer* claim were equally untimely. As made clear during the November 10 conference, the former claim concerned events which concluded in April, 1973; the latter involved an incident which occurred in 1962. Under the plain dictate of *Evans,* these claims were not permitted to proceed to trial.

Franklin's *seniority* claim, however, was a different matter. Liberally construed, plaintiff's claim was interpreted as a challenge to the *bona fides* of Patapsco's unit system of seniority. This claim, along with identical claims brought by each of the five other plaintiffs, was set for trial notwithstanding Patapsco's contention that *Evans* immunized the system from attack by these particular plaintiffs. In the opinion of this Court, a challenge to the *bona fides* of an ongoing seniority system constituted a valid assertion of continuing discrimination, and *Evans* was hence inapposite. The Fourth Circuit has recently confirmed this interpretation of *Evans* and its progeny. *Patterson v. American Tobacco Company,* 634 F.2d 744 at 752 (4th Cir. 1980) (*en banc*). Accordingly, the legitimacy of Patapsco's unit seniority system was the sole claim which Franklin was permitted to pursue against the defendant Railroad.

b) *Plaintiff Richard O. Pearson*
*Complaint Filed:* October 1, 1976
*§ 1981 Limitations Date:* October 1, 1973
*EEOC Charges Filed:* May 10, 1976
*Title VII Limitations Date:* November 13, 1975 (180 days pre-EEOC)

Plaintiff Pearson initially brought claims of discrimination in six areas: (1) job assignments; (2) promotions; (3) testing; (4) exclusion of blacks from administrative, executive and clerical positions; (5) discharge with loss of seniority; (6) layoff and recall. The *job assignment* claim was comprised of two separate subclaims. First, Pearson contended that his initial assignment to the position of trackman was discriminatory. At conference, however, counsel conceded that this initial assignment occurred in 1952, and therefore abandoned this claim. Second, Pearson sought to challenge his assignment to the position of laborer in the Locomotive Department in 1969, contending primarily that he was forced to accept disparate pay. This claim was similarly abandoned for limitations reasons.

Pearson's *testing* claim, an attack on the validity of a burner's test which this plaintiff took in 1965, was obviously time-barred and dismissed for that reason. The *promotion* claim arose from Pearson's contention that he was discriminatorily denied a promotion to the position of "burner" upon completion of the burner's test. For the same reasons, this claim was dismissed. Each of this plaintiff's additional claims were voluntarily abandoned by counsel, with the exception of the seniority claim which was identical in all respects to that pursued by plaintiff Franklin. This latter claim was permitted to proceed to trial.

c) *Plaintiff Bert Jones*
*Complaint Filed:* October 1, 1976
*§ 1981 Limitations Date:* October 1, 1973
*EEOC Charges Filed:* February 25, 1976
*Title VII Limitations Date:* August 30, 1975 (180 days pre-EEOC)

Plaintiff Jones brought claims of discrimination in seven areas: (1) job assignments; (2) promotions; (3) testing; (4) layoffs; (5) exclusion from administrative, clerical and executive positions; (6) vacation preference and vacation bonus; and (7) seniority. The *job assignment* claim was comprised of two separate subclaims. First, Jones complained of his ongoing assignment to an all-black work unit in the Maintenance-of-Way department. However, Jones acknowledged that the Maintenance-of-Way Department was integrated in December of 1967; hence, this claim was found to be untimely. Second, Jones asserted that he was initially assigned to the position of Trackman and that such an assignment was racially discriminatory. Counsel conceded, however, that Jones' initial assignment occurred in 1955, well in advance of the applicable limitations periods. Hence, his job assignment claim was dismissed.

For similar reasons, and again with the exception of the *seniority* claim, the re-

mainder of Jones' allegations were dismissed at the November 10 conference. The *promotion* claim concerned events which occurred in 1967, as did the *testing* claim. The *layoff* cause of action allegedly arose from events which took place in 1971. Both the *exclusions* claims and the *vacations* claims were voluntarily abandoned by counsel, and were untimely in any event. Accordingly only the seniority claim was permitted to proceed to trial.

d) *Plaintiff Cecil C. Stokes*

*Complaint Filed:* October 1, 1976

*§ 1981 Limitations Date:* October 1, 1973

*EEOC Charges Filed:* February 25, 1976

*Title VII Limitations Date:* August 30, 1975 (180 days pre-EEOC)

Plaintiff Stokes alleged discrimination in eight areas: (1) job assignments; (2) disparate pay; (3) exclusion from administrative, executive and clerical positions; (4) vacation preferences and vacation bonuses; (5) promotions; (6) transfers; (7) testing; and (8) seniority. The *job assignments* claim was comprised of two separate subclaims: Stokes' initial assignment to the Maintenance-of-Way department (1956), and his continuing assignment (until 1967) to an all-black work unit. Both claims were dismissed on limitations grounds. The *disparate pay* claim was premised upon events which terminated in 1968, and was likewise untimely. The *exclusion* claims and the *vacations* claims were abandoned by counsel. The remaining claims, however, were all set for trial. Stokes' attack on the *bona fides* of the unit seniority system was found to state an effective claim of continuing discrimination not subject to the *Evans* restrictions. The *testing* claim involved Stokes' contention that he was required to take a mechanic's test in 1976 which was not required of similarly-situated whites. That claim was permitted to proceed on a disparate treatment theory. However, plaintiff was not permitted to attack the test on disparate impact grounds, as it was conceded that only two (2) blacks had ever taken this specific test. The Court held this to be an inadequate sample for disparate impact purposes. *See Vanguard Justice Society, Inc. v. Hughes*, 471 F.Supp. 670, 19 FEP Cases 587, 627–8 (D.Md.1979) (seven

(7) persons an inadequate sample for a disparate impact claim); Schlei and Grossman, *Employment Discrimination Law*, 1979 Supp., p. 35 (adverse impact data must be based upon an adequate sample). The *transfer* claims were permitted to proceed insofar as they concerned events which allegedly occurred in 1973 (timely under § 1981) and 1976 (timely under § 1983 and Title VII). Finally, the *promotion* claim, which involved Patapsco's refusal to promote Stokes to the position of Mechanic in 1976 after he had failed the mechanic's test, was found timely and was permitted to proceed.

e) *Plaintiff William Harvey, Jr.*

*Complaint Filed:* October 1, 1976

*§ 1981 Limitations Date:* October 1, 1973

*EEOC Charges Filed:* January 11, 1975 as to promotions and benefits claims (simultaneous filing with the Maryland Commission on Human Relations [MCHR]); March 10, 1976 as to all other claims.

*Title VII Limitations Date:* March 17, 1974 as to promotions and benefits claims (300 days pre-MCHR); September 12, 1975 as to all other claims (180 days pre-EEOC).

Harvey alleged discrimination in five areas: (1) job assignments; (2) promotions; (3) seniority; (4) vacation preference and vacation bonus; and (5) exclusion from administrative, executive and clerical positions. The *job assignments* claim related to Harvey's initial assignment to the Maintenance-of-Way department in April of 1956, and was dismissed as untimely. The *vacations* and *exclusion* claims were abandoned by counsel. The remaining two claims were set for trial. Harvey's *seniority* claim was found to be identical to that raised by the other plaintiffs, and thus stated a legitimate cause of action. The *promotions* claim was permitted to proceed under § 1981, insofar as it involved events which allegedly occurred in 1974.

f) *Plaintiff Wallace Day*

*Complaint Filed:* October 1, 1976

*§ 1981 Limitations Date:* October 1, 1973

*EEOC Charges Filed:* March 4, 1976

*Title VII Limitations Date:* September 6, 1975 (180 days pre-EEOC)

Plaintiff Day alleged discrimination in seven areas: (1) job assignments; (2) promotions; (3) vacation bonus; (4) testing; (5) retirement benefits; (6) exclusion from administrative, executive and clerical positions; and (7) seniority. The *job assignments* claim consisted of two separate subclaims: discriminatory initial assignment to the Maintenance-of-Way department (1956), and continued assignment to an all-black work unit (1956–1967). Both claims were found to be time-barred. The *vacations, testing, exclusion,* and *retirement benefits* claims were either abandoned by counsel or similarly dismissed as untimely. The *seniority* claim was found to state a legitimate cause of action under a continuing discrimination theory, and the *promotions* claim was permitted to proceed to the extent that it concerned events which allegedly took place in 1974. This latter claim, however, was limited to 42 U.S.C. § 1981.

## II. Claims Against Defendants Steelworkers, Local 2819, Local 5054

Initially, each plaintiff sued each of the Union defendants on two separate theories: (1) failure to properly represent the plaintiffs in grievances against the defendant Railroad; and (2) entering into racially-discriminatory collective bargaining agreements. The former claim was voluntarily dismissed by counsel at the pre-trial conference. The latter claim, which in effect charged the defendants with negotiating a non-*bona fide* unit seniority system, was scheduled for trial.

As a result of the November 10 Pre-Trial Conference, the triable issues were as follows:

Seniority Claim (the present seniority system is not *bona fide* ):
*Remaining Plaintiffs:* All
*Remaining Defendants:* All

Promotions Claims (disparate treatment theory only):
*Remaining Plaintiffs:* Day, Harvey, Stokes
*Remaining Defendants:* Patapsco
Transfer Claim (disparate treatment theory only):
*Remaining Plaintiff:* Stokes
*Remaining Defendant:* Patapsco
Testing Claim (disparate treatment theory only):
*Remaining Plaintiff:* Stokes
*Remaining Defendant:* Patapsco

## Part Two: The December 1980 Trial

### I. The Seniority Claim

■ Plaintiff's principal claim, the subject of the bulk of the testimony at trial, is that the unit seniority system negotiated by Patapsco and Steelworkers is unlawful under both Title VII and § 1981. As noted previously, the initial collective bargaining agreement entered into between the Railroad and the Union took effect on September 1, 1943. Defendant Patapsco Exhibit # 66. This agreement governed Patapsco's relations with employees in the Maintenance-of-Way department, the sole department organized at that time. Article VII of the 1943 agreement sets forth the seniority rules which operated in Maintenance-of-Way, and dictates that a unit (as opposed to a plantwide) system would govern the parties to the agreement. Over the course of the succeeding years, this unit seniority system was incorporated into each additional Patapsco-Steelworkers collective bargaining agreement, with the relevant provisions remaining virtually intact.[2] For example, the initial collective bargaining agreement which governed employees in the Locomotive Repair Shop, effective March 16, 1956, memorializes such a unit seniority system. Defendant Patapsco Exhibit # 72, Rule 8. Similarly, the 1962 collective bargaining agreement entered into between Steelwork-

---

**2.** The evidence submitted at trial further indicates that, as a practical matter, a unit seniority system had been in effect at Patapsco's plant since at least the early 1930's. *See* testimony of Daniel Reimer, Vice President of Personnel and Labor Relations for the Bethlehem Steel Company subsidiary railroads. This seniority system was also in effect in the non-unionized departments at Patapsco during the mid-1940's. Defendant Patapsco Exhibits # 68 and 69.

ers and the six Bethlehem Steel railroad subsidiaries, including Patapsco, carries forward this unit system. Defendant Patapsco Exhibit # 79. Most recently, the 1977 collective bargaining agreement once again carries forward the unit system, with only very minor revisions. Defendant Patapsco Exhibit # 84. Indeed, plaintiffs do not seriously dispute the fact that Patapsco's seniority system has remained virtually intact from the early 1940's to the present day.

Given these undisputed facts, the legality of the Patapsco-Steelworkers seniority system is strictly governed by § 2000e–2(h) of Title VII, 42 U.S.C. § 2000e *et seq.*, and the cases interpreting this provision.[3] § 2000e–2(h) reads in part:

> (h) Notwithstanding any other provision of this subchapter, it shall not be an unlawful employment practice for an employer to apply different standards of compensation, or different terms, conditions, or privileges of employment pursuant to a *bona fide* seniority or merit system, or a system which measures earnings by quantity or quality of production or to employees who work in different locations, provided that such differences are not the result of an intention to discriminate because of race, . . . .

§ 2000e–2(h) thus stands as an exception to the general Title VII precept that an intent to discriminate need not be found where an employment practice adversely impacts upon a protected class. *Griggs v. Duke Power Co.*, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971). In order to recover, then, the plaintiffs must prove that Patapsco's unit seniority system is not *bona fide* within the meaning of Title VII.

This conclusion was first announced in the hallmark case interpreting § 2000e–2(h), *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977). In *Teamsters*, the Supreme Court considered a case in which minority employees had been discriminatorily assigned upon hire to "city driving" jobs rather than to higher paying over the road "line driving" jobs. Among the claims advanced by the Government was that the seniority system adopted by the company and the Teamsters was unlawful in that it perpetuated these discriminatory assignments. This claim arose from the fact that the city driving jobs and the line driving jobs were in separate bargaining units, and that an employee who transferred from one to the other could not bring with him his accumulated seniority. The lower courts found for the Government on this seniority claim. The Supreme Court, however, reversed. After analyzing the legislative history of Title VII, the Court concluded:

> In sum, the unmistakable purpose of § 703(h) [§ 2000e–2(h)] was to make clear that the routine application of a bona fide seniority system would not be unlawful under Title VII. As the legislative history shows, this was the intended result even where the employer's pre-Act discrimination resulted in whites having greater existing seniority rights than Negroes. Although a seniority system inevitably tends to perpetuate the effects of pre-Act discrimination in such cases, the congressional judgment was that Title VII should not outlaw the use of existing seniority lists and thereby destroy or water down the vested seniority rights of employees simply because their employer

**3.** The recent Fourth Circuit case of *Patterson v. American Tobacco Company*, 634 F.2d 744 (4th Cir. 1980) (*en banc*) is not to the contrary. In *Patterson*, the court expressly noted that § 2000e–2(h) governs the legality of seniority systems which were adopted prior to the passage of the Civil Rights Act of 1964 (Title VII), and which have been routinely applied in the post-Act period. *Id.* at 10, fns. 3 and 4. The evidence in this case clearly establishes that the present Patapsco seniority system is identical, in all relevant respects, to the seniori-

ty systems which existed at the Railroad prior to adoption of Title VII. In light of this evidence, this Court holds that the current Patapsco-Steelworkers unit seniority system is a "routine application" of the pre-Act system, and is therefore governed by § 2000e–2(h) of the Civil Rights Act of 1964. Under these circumstances, it is further clear that the legal tests under Title VII and § 1981 are identical. *Johnson v. Ryder Truck Lines, Inc.*, 575 F.2d 471, 474–75 (4th Cir. 1978), *cert. denied*, 440 U.S. 979, 99 S.Ct. 1785, 60 L.Ed.2d 239 (1979).

had engaged in discrimination prior to the passage of the act.

\*   \*   \*   \*   \*   \*

Accordingly, we hold that an otherwise neutral, legitimate seniority system does not become unlawful under Title VII simply because it may perpetuate pre-Act discrimination. Congress did not intend to make it illegal for employees with vested seniority rights to continue to exercise those rights, even at the expense of pre-Act discriminatees.

*Id.* at 352–53, 97 S.Ct. at 1863–64.

Having thus disposed of the Government's argument which was grounded upon *Griggs*, the Court went on to consider whether the seniority system before it was *bona fide* :

The seniority system in this litigation is entirely *bona fide*. It applies equally to all races and ethnic groups. To the extent that it "locks" employees into non-linedriver jobs, it does so for all. The city drivers and servicemen who are discouraged from transferring to line-driver jobs are not all Negroes, or Spanish-surnamed Americans; to the contrary, the overwhelming majority are white. The placing of line drivers in a separate bargaining unit from other employees is rational, in accord with the industry practice, and consistent with the National Labor Relations Board precedents. It is conceded that the seniority system did not have its genesis in racial discrimination, and that it was negotiated and has been maintained free from any illegal purpose.

*Id.* at 355–56, 97 S.Ct. at 1864–65. *Teamsters*, therefore, stands for the proposition that an otherwise neutral seniority system will not be held in violation of Title VII merely because it tends to perpetuate the effects of past discrimination. In order to violate Title VII, the seniority system must be found to be not *bona fide*.

The Fourth Circuit has recently had occasion to consider the question of the *bona fides* of a unit seniority structure in *Younger v. Glamorgan Pipe and Foundry Co.*, 621 F.2d 96, 97 (4th Cir. 1980), and on that occasion affirmed *per curiam* the decision of the District Court that the seniority system

was *bona fide*. That District Court opinion set out in detail the factors to be considered when the *bona fides* of a seniority system is challenged. These factors were:

1). Whether the system was facially neutral; *i. e.*, whether it applied equally to all races and ethnic groups;

2). Whether the type of seniority system in use was rational and in accord with industry practice;

3). Whether the system had its genesis in racial discrimination; and

4). Whether the system was negotiated and maintained free from any illegal purpose.

*Younger*, 20 FEP Cases 776, 784 (W.D.Va. 1979). These factors have also been applied in this District, *Carroll v. Bethlehem Steel Corp.*, Civil Action No. M–75–374, Opinion and Order at 20–21 (D.Md. May 15, 1980), *aff'd* Civil No. 80–1414 (4th Cir. December 30, 1980), and in other Circuits. *See, e. g., James v. Stockham Valves & Fittings Co.*, 559 F.2d 310, 352 (5th Cir. 1977).

■ Application of these four factors to the seniority system presently in effect at Patapsco reveals that the system is *bona fide* within the meaning of Title VII and § 1981. First, the system is facially neutral; there is no evidence to suggest that the system on its face is racially biased. Second, it is abundantly clear that the unit seniority system in effect at Patapsco was (and is) rational and in accord with general industry practice. The evidence indicates, initially, that the unit system was a natural byproduct of the employment expectations of both labor and management. *See, e. g.,* testimony of James A. Fisher, Master Mechanic at Patapsco, and Melvin S. Phelps, former Assistant Superintendent of Operations for the Railroad. These expectations, in general, center around the notion that an employee would begin and end his employment in a particular department or craft, acquiring a specialization within that craft along the way. This acquisition of a specialization within a particular craft is critical in that job experience within one railroad industry department is not a useful or

valuable training for jobs existing within different departments. As a consequence, it was quite logical that seniority at Patapsco would be measured by an employee's length of service within his unit, rather than by his plantwide service. Furthermore, the evidence is likewise clear that the unit seniority system was (and is) an industry-wide practice; Patapsco's seniority system is in no way aberrational. The uncontroverted testimony of Daniel Reimer established that departmental seniority has been, and continues to be, the rule in the railroad industry throughout the country. It has also been the universal rule within the six Bethlehem Steel railroad subsidiaries. From the background, it is plainly established that *bona fide* business purposes were the motivating factors behind Patapsco and Steelworker's adoption of unit seniority. The system, accordingly, is both in accordance with general industry practice, and rational. *See also Carroll v. Bethlehem Steel Corp., supra*, at 26.

■ Finally, there is absolutely no evidence to suggest either that the system had its genesis in racial discrimination, or that it was subsequently maintained for illegal purposes. The burden of proving such a discriminatory purpose, of course, rests with the plaintiffs, who are to be guided by the definition spelled out in *Personnel Administrator of Massachusetts v. Feeney*, 442 U.S. 256, 99 S.Ct. 2282, 60 L.Ed.2d 870 (1979):

> 'discriminatory purpose' . . . implies more than intent as volition or intent as awareness of consequences. *See United Jewish Organizations v. Carey*, 430 U.S. 144, 179 [97 S.Ct. 996, 1016, 51 L.Ed.2d 229] (concurring opinion). It implies that the decisionmaker . . . selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group. (footnotes omitted).

Plaintiff, indeed, suggested throughout trial that Patapsco's unit seniority system was adopted because of its alleged adverse impact upon blacks and other minorities. However, the sole proof offered on this point by the plaintiffs is the simple fact that Patapsco's Maintenance-of-Way department (predominantly black) is repre-

sented by United Steelworkers Local 2819, whereas Patapsco's other departments (predominantly white) are represented by a separate Steelworkers Local, # 5054. While it is true that this two-locals situation is not in accordance with railroad industry practice, there is nothing in the record which indicates that the unit seniority system was adopted because of this organizational irregularity. To the contrary, all of the evidence shows that the unit system would have been adopted regardless of the Union's organizational set-up, given the general industry practice and the *bona fide* business motivations mentioned above. Further, the only *direct* evidence bearing on this issue is the testimony of the various Company and Union witnesses, testimony that categorically states that the unit seniority system was not designed and/or maintained for discriminatory purposes. This is the *sole* evidence presented at trial which relates to the question of "discriminatory purpose"; thus the plaintiffs have not met their burden of establishing a discriminatory genesis. Accordingly, the seniority system currently in use at the Patapsco & Back Rivers Railroad Company is *bona fide* within the meaning of § 2000e–2(h) and § 1981.

## II. *The Disparate Treatment Claims*

■ The remaining individual claims are premised upon a disparate treatment theory. Courts find disparate treatment where a member of a protected group is treated differently than other similarly-situated individuals, and where there is no adequate non-racial explanation for the differential treatment. Proof of discriminatory intent, of course, is critical in disparate treatment cases, regardless of whether the plaintiff proceeds under Title VII or § 1981. Indeed, the legal tests for determining whether or not a valid disparate treatment claim exists are identical under either of these two statutes. *See, e. g., Gay v. Waiters' and Dairy Lunchmen's Union, Local No. 30*, 489 F.Supp. 282 (N.D.Cal.1980), and cases cited therein.

■ Because direct evidence of discriminatory intent is difficult to produce, the Supreme Court has established a three-

part analysis which the courts are to undertake in scrutinizing typical disparate treatment situations. As set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973):

> The complainant in a Title VII trial must carry the initial burden under the statute of establishing a prima facie case of racial discrimination. This may be done by showing (i) that he belongs to a racial minority [or a protected class]; (ii) that he applied and was qualified for a job [or promotion or transfer] for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications.

Discrimination is inferred once this prima facie showing is made because "experience has proved that in the absence of other explanation it is more likely than not those actions were bottomed on impermissible considerations." *Furno Construction Corp. v. Waters*, 438 U.S. 567, 98 S.Ct. 2943, 57 L.Ed.2d 957 (1978). Assuming that a prima facie case is proved, "[t]he burden then must shift to the employer to articulate some legitimate, nondiscriminatory reason for the employee's rejection." *McDonnell Douglas v. Green*, 411 U.S. at 802, 93 S.Ct. at 1824. If the defendant is successful in proving, by a preponderance of the evidence, that the prima facie discriminatory act was based upon a "legitimate, nondiscriminatory reason," the burden then shifts back to the plaintiff to prove that defendant's rationale was a mere pretext for discrimination. *Id.* The individual claims of the plaintiffs in the present case will be judged in accord with these general teachings of *Green*.

### a). *The Promotions Claims*

The Fourth Circuit, and this District, have adopted the *McDonnell Douglas v. Green* test for resolving disparate treatment promotions claims. *Ambush v. Montgomery County Government Department of Finance*, 620 F.2d 1048, 1052 (4th Cir. 1980);

*Cussler v. University of Maryland*, 430 F.Supp. 602 (D.Md.1977).

### —*Plaintiff Day*

According to the evidence introduced at trial, Day was initially hired by Patapsco as a trackman in the Maintenance-of-Way department in 1956. Sometime later he was assigned the job of Motor Vehicle Operator (MVO) in the same department. In 1974, Day alleges that he sought the position of trainee foreman in the Maintenance-of-Way unit, and further alleges that the position was ultimately filled by one Price, a white male. This 1974 incident is the basis for Day's promotion claim.

This Court finds Day's claim to be without merit. According to his own testimony, Day was in fact given the position of trainee foreman in 1974 as per his request. He later voluntarily resigned that position as a result of a dispute over the type of work which he would be required to perform during the hours in which he was not receiving foreman training. Plaintiff candidly admitted that this dispute was in no way discriminatory in nature. Accordingly, this Court finds that Day has failed to establish a prima facie case of racial discrimination under the *McDonnell Douglas v. Green* test, in that criterion # 3 of that test has not been satisfied. In other words, there is no evidence to indicate that Day was ever denied the promotion he sought.

### —*Plaintiff Stokes*

In 1956, Stokes was hired by the Bethlehem Steel Corporation, and soon thereafter was sent to Patapsco's Maintenance-of-Way department to work as a trackman. He has remained in that department to the present day, serving both as trackman and (since 1967) as MVO.

In his pleadings, Stokes alleged that he was discriminatorily denied a promotion on two occasions: in 1973 (timely under § 1981), and in 1976 (timely under § 1981 and Title VII). At trial, however, Stokes produced no evidence as to his 1973 claim. The only testimony submitted by Stokes concerning events which occurred in 1973 involves one Leroy Harris, an individual

who was hired off the street as a laborer in the Locomotive department in that year. Stokes, at the time, complained that the position for which Harris was hired had not been properly posted. Two factors, however, lead this Court to conclude that Stokes is not alleging *personal* harm as a result of this failure to post, and that consequently, this incident does not establish even an arguable promotions claim. First, the testimony indicates that the laborers job for which Harris was hired was a lower paying position than was the job held by Stokes in Maintenance-of-Way. This Court is certain that Stokes would not have applied for the opening even had he known about it. The second factor reinforces this conclusion. The job for which Harris was hired was located in the Locomotive department, a completely separate unit from Maintenance-of-Way. To take that job, Stokes would have been required to forfeit his seniority (17 years) as well as accept a cut in pay. Thus, while this Court doubts very seriously whether Stokes was attempting to allege a discriminatory promotion claim when he testified about this 1973 incident, it is patently clear that Stokes himself would not have applied for the laborers job even had he known of its existence. Accordingly, under *Green,* a prima facie case has not been established. *See* criterion 2.

Stokes' second promotions claim is equally improper. In 1976, Stokes sought a position as Mechanic's Helper in the Locomotive department, a higher paying job than was available to him in Maintenance-of-Way. To obtain this position, Stokes was required to take, and pass, a mechanic's test. The uncontroverted evidence indicates that he failed that test. As a result, this plaintiff has not sustained his burden, under *Green,* of showing that he was qualified for the position which he sought and was refused. Accordingly, plaintiff's second promotions claim must likewise be dismissed.

—*Plaintiff Harvey*

■ Harvey was initially employed by Patapsco in 1956, and was assigned to the Maintenance-of-Way department as a trackman. His promotion claim centers around events which took place in 1974 (timely under § 1981). In that year, Harvey sought and was denied the position of general foreman in the Maintenance-of-Way unit. This job was ultimately filled by John Wehner, a white male with less unit seniority than Harvey. Harvey contends that Patapsco's refusal to promote him to this general foreman position was discriminatory.

To establish a prima facie case of discrimination under *McDonnell Douglas,* a plaintiff is required to show, *inter alia,* that he was qualified for the promotion for which the employer was seeking applicants. On the present record, there is no evidence from which this Court can conclude that Harvey was qualified for the general foreman position. To be sure, the testimony of both plaintiff and defense witnesses indicates that there are no precise, objective criteria which guide Patapsco in their promotional decisions. These omissions are troublesome. For one thing, the use of subjective criteria in promotional decision-making is often employed as a covert mask for discriminatory actions. *See, e. g., Falcon v. General Telephone Co. of the Southwest,* 626 F.2d 369 (5th Cir. 1980). While there is no evidence in the present case that such is Patapsco's purpose, it is nonetheless extremely unwise from a legal standpoint to persist in the use of subjective, personal criteria. In addition, from a purely business viewpoint, the use of objective criteria in promotional decisions often lends itself to better employer-employee relations. Patapsco's seeming indifference to these two goals is a matter of some concern to this Court, and in a different setting, could very well be viewed as evidence of a discriminatory intent.

However, the instant claim does not present such a setting. The plaintiff has presented no evidence from which this Court could logically conclude that Harvey would have qualified for the general foreman position under *any* criteria. In fact, the sole evidence regarding Harvey's supervisory capabilities is extremely damaging to the plaintiff's claim. Eugene Robertson, a defense witness, testified during trial that Harvey was incapable of exercising any of

the responsibilities concomitant with the general foreman position. This opinion was to some extent borne out when, in 1977, Harvey was suspended from work after falsifying time cards and leaving the track in a highly dangerous condition while serving a brief stint as a trainee foreman. Most damaging is the complete dearth of evidence upon which this Court could base an informed opinion that Harvey was indeed qualified—even as qualified as Wehner—to hold the foreman position. In the absence of such evidence, the Court has no alternative but to hold that Harvey has failed to make out a prima facie case under *Green*. This claim must therefore be dismissed.

b). *The Transfer Claim*

—*Plaintiff Stokes*

Stokes' transfer claim is identical to his 1976 promotions claim, *i. e.*, he alleges that he was denied the opportunity to transfer into the Locomotive Department on account of his failing the mechanic's test. This claim must be dismissed for the same reasons as the promotions claim, *supra*.

c). *The Testing Claim*

—*Plaintiff Stokes*

 Stokes' final contention is that he was treated in a disparate manner when he was required to take the mechanic's test in 1976. As earlier noted, plaintiff was not permitted to attack the validity of the testing requirement on disparate impact grounds, due to the inadequate sample size. Accordingly, he was limited to the disparate treatment theory. On the basis of the uncontroverted evidence, Stokes' claim in this regard must be dismissed. This evidence shows that he was *not* required to take an examination from which similarly-situated applicants were excused. To the contrary, he was but one of at least five applicants some of whom were white who took the mechanics examination at the same time, and for the same position, in 1976. This claim is therefore frivolous, and must likewise be dismissed.

The findings of fact and conclusions of law contained herein are made in accordance with the provisions of Rule 52, F.R. Civ.P., whether or not so identified.

Accordingly, for the reasons stated herein, it is this 15th day of January, 1981, by the United States District Court for the District of Maryland, ORDERED: that judgment BE and the same IS hereby entered in favor of the defendants Patapsco & Back Rivers Railroad Company, United Steelworkers of America, Local 2819, and Local 5054.