**Jaime GOODMAN, Plaintiff,**

v.

**MERRILL LYNCH & CO., INC., Merrill Lynch, Pierce, Fenner & Smith and Bank of America Corp., Defendants.**

No. 09 Civ. 5841(SAS).

United States District Court, S.D. New York.

April 6, 2010.

48. 18 U.S.C. § 983(a)(3)(D) (emphasis added).

49. Claimants' Reply at 4.

Shona B. Glink, Esq., Meites, Mulder, Mollica & Glink, Linda D. Friedman, Esq., George S. Robot, Esq., Suzanne E. Bish, Esq., Jennifer S. Gilbert, Esq., Patricia A. Bronte, Esq., Stowell & Friedman, Ltd., Chicago, IL, for Plaintiff.

Carole G. Miller, Esq., Jeffrey A. Lee, Esq., Audrey Y. Dupont, Esq., Maynard, Cooper & Gale, P.C., Birmingham, AL, Allan Dinkoff, Esq., Jeffrey S. Klein, Esq., Weil, Gotshal & Manges LLP, New York, NY, for Defendants.

### OPINION AND ORDER

SHIRA A. SCHEINDLIN, District Judge:

## I. INTRODUCTION

Jaime Goodman brings this action against Merrill Lynch & Co., Inc., Merrill Lynch, Pierce, Fenner & Smith, and Bank of America Corporation (collectively "de-fendants"), claiming gender discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), the Equal Pay Act ("EPA"), the New York State Human Rights Law ("NYSHRL"), and the New York City Human Rights Law ("NYCHRL"). Defendants move for partial judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. Specifically, defendants seek judgment on the pleadings as to all of Goodman's claims relating to defendants' Advisor Transition Program ("ATP"), asserting that the ATP is a production-based payment program of the type expressly sanctioned by section 703(h) of Title VII ("section 703(h)"). For the reasons that follow, plaintiff's claims related to the ATP are dismissed with leave to replead.

## II. BACKGROUND [1]

### A. In General

Jaime Goodman is currently a Financial Advisor ("FA") at Merrill Lynch, where she has been employed since August 1992.[2] Throughout her employment, Merrill Lynch has compensated and distributed resources and business opportunities to its FA's based on a " 'quintile system' that measures and ranks and segregates brokers based on 'production' " and "length of service." [3] Production is measured in "production credits," which are essentially "commissions earned on client assets managed by [each] FA." [4] Pursuant to the quintile system, FA's with the highest twenty percent of production are in the top quintile, FA's with the lowest twenty percent of production are in the bottom quintile, and the remaining FA's are ranked in

---

1. This factual background is drawn from the Amended Complaint ("Complaint") and is construed in the light most favorable to plaintiff.

2. *See id.* ¶ 6.

3. *Id.* ¶¶ 9, 20.

4. *Id.* ¶ 9 & n. 3.

the three middle quintiles.[5] Based on this system, Merrill Lynch determines eligibility for, inter alia, titles, offices, sales assistance, distribution of accounts of departing brokers, walk-ins, leads, and referrals.[6] Under this system, "success breeds success," and favorable treatment garners additional production credits which in turn lead to even more favorable treatment and more production credits.[7]

Female FA's in general are underrepresented in the top quintiles of production and overrepresented in the bottom quintiles of production.[8] Nonetheless, Goodman herself has consistently scored in the top quintiles.[9] However, Goodman's production score is still "considerably lower" than it would be absent Merrill Lynch's historic and ongoing "nationwide pattern and practice" of "systematic and pervasive sex discrimination," and she claims to have suffered "substantial compensation losses" as a result.[10]

### B. Historic and Ongoing Discrimination

Goodman identifies a long history of systematic discrimination against women by Merrill Lynch.[11] In 1974, the Equal Opportunity Employment Commission sued Merrill Lynch over its alleged refusal to hire women and minorities as FA's.[12] In resolution of the lawsuit, Merrill Lynch agreed to the entry of a Consent Decree ("O'Bannon Consent Decree") requiring it to increase the number of women as an overall percentage of its FA's to twenty-five percent.[13] Goodman alleges that Merrill Lynch has never fulfilled the requirements of the O'Bannon Consent Decree.[14]

In 1996, a class of female FA's sued Merrill Lynch for "systematic sex discrimination." [15] Under a court approved settlement, an alternative dispute resolution process—the Claim Resolution Process ("Cremin CRP")—was established for class members to pursue their individual and class claims.[16] Every Cremin CRP arbitration panel has found that Merrill Lynch had engaged in a "pattern and practice of sex discrimination against female FA's." [17] As recently as 2004, an arbitration panel awarded a class member over two million dollars in damages, including punitive damages.[18] In reaching this award, the panel held:

> Having considered the class-wide statistical evidence ... the Panel finds that the disparate earnings of females and males were the result of Merrill's discriminatory practices including, but not limited to an unequal distribution of accounts to female [FA's] ... and a male-dominated organizational structure at Merrill which created an environment in which managerial discretion was influenced by gender stereotypes adversely

5. See id. ¶ 9.

6. See id. ¶ 9 & n. 4.

7. See id.

8. See id. ¶ 9.

9. See id. ¶ 20.

10. Id. ¶¶ 7, 20.

11. See id. ¶ 10.

12. See id. ¶ 11.

13. See id.

14. See id.

15. Id. ¶ 12.

16. See id.

17. Id. ¶ 13.

18. Id. ¶ 13.

affecting female [FA'S] .... [19]

Beginning in the mid–1990's, Merrill Lynch developed a system of "partnership models" for its FA's that were designed to "manipulate the account distribution policy to the benefit of male [FA's] and to the detriment of female [FA's]." [20] Unlike partnerships solely between male FA's, coed partnerships had "inequitable terms," were not formed "using standardized Merrill Lynch 'team' policies," and were not "formalized in writing." [21] When partnerships involving women were dissolved, female FA's did not receive the same equitable distribution of accounts that their male counterparts received. [22]

In January 2003, Goodman joined the existing partnership of two male FA's, Robert Sabel and James Schwantner. [23] At the time Goodman joined this partnership, Sabel's share of the partnership exceeded ninety percent based on the larger share of assets he had contributed as compared to Schwantner. [24] When Goodman joined the partnership, she contributed assets equal in size to Sabel's contribution and assumed a partnership share equal to that of Sabel. [25] However, when Sabel left the partnership in 2003, although Goodman's assets were three times the size of those held by Schwantner, Schwantner's share of the remaining partnership assets doubled to thirty percent. [26] Merrill Lynch management and Schwantner then pressured Goodman into further increasing the size of Schwantner's share of the partnership to fifty percent. [27]

When the Goodman–Schwantner partnership finally dissolved in 2006 with the defection of Schwantner to a rival brokerage firm, Goodman's manager distributed Schwantner's remaining assets to the office at large despite official Merrill Lynch policy directing that the remaining assets should have been distributed to Goodman alone. [28] When Goodman complained to Merrill Lynch management, she was "retaliated against and her performance and achievements [were] ignored." [29]

Goodman alleges an ongoing "pattern and practice of gender discrimination" as well. [30] Merrill Lynch "maintains companywide employment and compensation policies and practices that deny female FA's the same income-generating opportunities and resources as male FA's." [31] Merrill Lynch's "gender-based hostile corporate culture and policies and practices" accomplish this by steering "business opportunities and resources" to male FA's and away from female FA's. [32] Merrill Lynch managers employ "various mechanisms" to "circumvent" corrective measures and funnel "productive assets and other income-generating opportunities to male [FA's], and away from female [FA's]." [33]

19. *Id.*

20. *Id.* ¶¶ 15–16.

21. *Id.* ¶ 17.

22. *See id.*

23. *See id.* ¶ 21.

24. *See id.*

25. *See id.* ¶ 22.

26. *See id.* ¶ 23.

27. *See id.*

28. *See id.* ¶¶ 26–31.

29. *Id.* ¶ 36.

30. *Id.* ¶ 7.

31. *Id.*

32. *Id.* ¶ 10.

33. *Id.* ¶ 14.

## C. The ATP

On January 1, 2009, Bank of America acquired Merrill Lynch in a fifty-billion dollar all-stock transaction, and Merrill Lynch now operates as a subsidiary of Bank of America.[34] As part of the acquisition, both companies announced that they would be paying retention awards under the ATP to Merrill Lynch FA's.[35] Merrill Lynch executives explained in a company-wide broadcast that the ATP retention awards would be based on "projections of FAs' future contributions or 'production,' in essence, future commissions earned on client assets managed by the FA."[36] Under the "formula" used by the ATP, FA's would receive retention awards based on "annualized production" through September 2008.[37]

Goodman alleges that Bank of America was well aware of Merrill Lynch's past and present discriminatory practices and the role they played in depressing female FAs' production scores, suggesting that Bank of America knew that the ATP would have a disparate impact on the retention of female FA's.[38] Goodman further alleges that defendants "intentionally designed and implemented retention bonuses based largely on production that had a disparate impact on and intentionally discriminated against women."[39] "Defendants identified and se-lected for retention and higher compensation and knew that they were offering more generous retention packages to white men than women."[40] "Simply put, defendants intended to retain and more generously compensate white men rather than female FA's."[41] Goodman alleges that "but for defendants' intentional gender discrimination," she would have received a higher retention award under the ATP.[42]

## III. APPLICABLE LAW

### A. Rule 12(c)

 Under Rule 12(c), after the pleadings close, but before the trial begins, a party may move for judgment on the pleadings, provided that the motion is made early enough so as not to delay the trial.[43] Judgment on the pleadings should be granted if it is clear from the pleadings that the moving party is entitled to judgment as a matter of law.[44] In evaluating a motion for judgment on the pleadings, the court applies the same standard as that applicable to Rule 12(b)(6) motions to dismiss for failure to state a claim.[45] As in the context of a motion to dismiss, the court "must accept as true all of the factual allegations contained in the complaint"[46] and "draw all reasonable inferences in the plaintiff's favor."[47] However, the court need not accord "[l]egal conclusions, de-

34. *See id.* ¶ 5.

35. *See id.* ¶ 18.

36. *Id.*

37. *Id.*

38. *See id.* ¶ 9.

39. *Id.*

40. *Id.*

41. *Id.*

42. *Id.* ¶¶ 18–19.

43. *See* Fed.R.Civ.P. 12(c).

44. *See Burns Int'l Sec. Servs. v. International Union,* 47 F.3d 14, 16 (2d Cir.1995).

45. *See Patel v. Contemporary Classics,* 259 F.3d 123, 126 (2d Cir.2001).

46. *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 572, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). *Accord Rescuecom Corp. v. Google Inc.,* 562 F.3d 123, 127 (2d Cir.2009).

47. *Ofori–Tenkorang v. American Int'l Group, Inc.,* 460 F.3d 296, 298 (2d Cir.2006).

ductions or opinions couched as factual allegations ... a presumption of truthfulness." [48]

With respect to the motion to dismiss standard in employment discrimination cases, the Supreme Court held in 2002, in *Swierkiewicz v. Sorema N.A.*, that a complaint need not allege specific facts establishing a prima facie case of discrimination.[49] Rather, "the ordinary rules for assessing the sufficiency of a complaint apply," which, at the time *Swierkiewicz* was decided,[50] involved the "no set of facts" standard articulated in *Conley v. Gibson.*[51]

In 2007, in *Bell Atlantic Corporation v. Twombly,* the Court "retired" the *Conley* "no set of facts" standard.[52] After *Twombly* and *Ashcroft v. Iqbal,*[53] a complaint must meet a standard of "plausibility" to survive a motion to dismiss.[54] A claim satisfies the plausibility standard "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." [55] While plausibility "is not akin to a probability requirement," plausibility requires "more than a sheer possibility that a defendant has acted unlawfully." [56] Pleading facts that are "merely consistent with a defendant's liability" [57] fails to "nudge[ ] [the plaintiff's] claims across the line from the conceivable to plausible." [58] Determining plausibility is a "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." [59]

While some courts and commentators have concluded that *Twombly* and *Iqbal* repudiated *Swierkiewicz*, at least to the extent that *Swierkiewicz* relied upon pre-*Twombly* pleading standards,[60] *Twombly* itself held that *Swierkiewicz* remains good law.[61] Reconciling *Swierkiewicz, Twom-*

48. *In re NYSE Specialists Sec. Litig.*, 503 F.3d 89, 95 (2d Cir.2007) (quotation omitted).

49. *See* 534 U.S. 506, 514, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002).

50. *See id.* at 512–15, 122 S.Ct. 992.

51. *See* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957) ("[A] complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.").

52. 550 U.S. at 563, 127 S.Ct. 1955.

53. *See* —— U.S. ——, 129 S.Ct. 1937, 1955, 173 L.Ed.2d 868 (2009).

54. *Id.* at 564, 127 S.Ct. 1955.

55. *Iqbal*, 129 S.Ct. at 1949 (quotation omitted).

56. *Id.* (quotation marks omitted).

57. *Id.* (quotation marks omitted).

58. *Twombly*, 550 U.S. at 570, 127 S.Ct. 1955.

59. *Iqbal*, 129 S.Ct. at 1950.

60. *Compare Fowler v. UPMC Shadyside*, 578 F.3d 203, 211 (3d Cir.2009) ("We have to conclude, therefore, that because *Conley* has been specifically repudiated by both *Twombly* and *Iqbal*, so too has *Swierkiewicz*, at least insofar as it concerns pleading requirements and relies on *Conley.*") *with Harper v. New York City Hous. Auth.*, 673 F.Supp.2d 174, 180 (S.D.N.Y.2009) ("[N]othing in *Iqbal* indicates that the Supreme Court intended that decision to affect the continued applicability of *Swierkiewicz*, and the courts in this district have continued to apply *Swierkiewicz* in employment discrimination claims.") (collecting cases).

61. *See Twombly*, 550 U.S. at 569–70, 127 S.Ct. 1955 ("Plaintiffs say that our analysis runs counter to *Swierkiewicz* .... [H]owever, *Swierkiewicz* ... simply re-emphasized ... that ... a heightened pleading standard for Title VII cases was contrary to the Federal Rule[s] .... Here, in contrast, we do not require heightened fact pleadings of specifics ....") (quotation marks and citations omitted).

*bly,* and *Iqbal,* a complaint need not establish a prima facie case of employment discrimination to survive a motion to dismiss; however, "the claim must be facially plausible and must give fair notice to the defendants of the basis for the claim." [62]

## B. Amendments to Pleadings

■ "Rule 15(a) provides that, other than amendments as a matter of course, a party may amend the party's pleading only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires." [63] "[W]hether to permit a plaintiff to amend its pleadings is a matter committed to the Court's sound discretion." [64] However, the Supreme Court has explained that

> [i]f the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits. In the absence of any apparent or declared reason—such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.—the leave sought should, as the rules require, be "freely given." [65]

Accordingly, " '[i]t is the usual practice upon granting a motion to dismiss to allow leave to replead.' " [66]

## C. Section 703(h)

■ Ordinarily, facially neutral policies and practices adopted without discriminatory intent that nevertheless have a discriminatory impact on a protected class may violate Title VII.[67] However, section 703(h) of Title VII expressly protects an employer's bona fide merit, seniority, and production-based compensation system, even where the system has a discriminatory impact. Section 703(h) provides in pertinent part:

> Notwithstanding any other provision of this subchapter, it shall not be an unlawful employment practice for an employer to apply different standards of compensation . . . pursuant to a bona fide seniority or merit system, or a system which measures earnings by quantity or quality of production . . . provided that such differences are not the result of an intention to discriminate because of race, color, religion, sex, or national origin . . . . [68]

Under this provision, a disparate impact alone is not enough to invalidate a bona fide merit, seniority, or production-based

---

62. *Fowler v. Scores Holding Co.,* 677 F.Supp.2d 673, 679 (S.D.N.Y.2009).

63. *Slayton v. American Express Co.,* 460 F.3d 215, 226 n. 10 (2d Cir.2006) (quotation marks omitted).

64. *McCarthy v. Dun & Bradstreet Corp.,* 482 F.3d 184, 200 (2d Cir.2007) (quotation marks omitted).

65. *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962). *Accord, e.g., Jin v. Metropolitan Life Ins. Co.,* 310 F.3d 84, 101 (2d Cir.2002).

66. *Vacold LLC v. Cerami,* No. 00 Civ. 4024, 2002 WL 193157, at *6 (S.D.N.Y. Feb. 6, 2002) (quoting *Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 48 (2d Cir.1991)). *Accord Hayden v. County of Nassau,* 180 F.3d 42, 53 (2d Cir.1999) ("When a motion to dismiss is granted, the usual practice is to grant leave to amend the complaint.").

67. *See American Tobacco Co. v. Patterson,* 456 U.S. 63, 64, 102 S.Ct. 1534, 71 L.Ed.2d 748 (1982) (citing *Griggs v. Duke Power Co.,* 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971)).

68. 42 U.S.C. 2000e–2(h).

compensation system.[69] Unless the plaintiff can prove that the compensation system was adopted with actual discriminatory purpose, it is immunized from violation of Title VII.[70] Discriminatory purpose means more than "intent as volition or intent of awareness of consequences."[71] To violate Title VII, the compensation system must be selected or reaffirmed "at least in part 'because of,' not merely 'in spite of,'" its adverse impact on the protected class.[72]

■■■■■ A merit, seniority, or production-based compensation system is "bona fide" if it applies equally to all employees the same way.[73] Even if the compensation system perpetuates the effect of other acts of discrimination that clearly violate Title VII, as long as the compensation system itself was adopted without discriminatory intent, it is immunized under section 703(h).[74] To the extent that other acts of discrimination in violation of Title VII affect the "inputs" into a bona fide merit, seniority, or production-based compensation system, a plaintiff's remedy lies in challenging those other violations directly.[75]

## IV. DISCUSSION

■■■■■ As described by Goodman in her Complaint, the ATP implemented by Merrill Lynch and Bank of America qualifies as a "bona fide" production-based compensation system for purposes of section 703(h). Pursuant to a gender-neutral formula, defendants awarded retention bonuses to high performing Merrill Lynch FA's measured solely based upon each individual FA's annualized production credits through September 2008. Although other discrimination by Merrill Lynch regarding account distributions and partnership formations may have affected the plaintiff's overall production credits, thereby skewing the inputs into the ATP, the ATP itself remains a protectable production-based compensation system under section 703(h).

Even so, Goodman could challenge the ATP if she alleges sufficient facts to make it plausible that the ATP was adopted with the intent to discriminate against female FA's in favor of male FA's. While Goodman clearly alleges that defendants adopted the ATP in order to under-compensate and otherwise discriminate against their female FA's, mere conclusory statements and recitations of the elements of a cause of action will not satisfy the plausibility standard. Goodman does offer detailed factual allegations of pervasive past and ongoing intentional discrimination on the part of Merrill Lynch. At best, however, Goodman alleges that defendants had knowledge of this past discrimination when they adopted the ATP. But knowledge of past and even present discrimination alone does not make it plausible that defendants actually adopted the ATP with discrimina-

---

69. *See American Tobacco Co.*, 456 U.S. at 65, 102 S.Ct. 1534.

70. *Id.*

71. *Personnel Administrator of Massachusetts v. Feeney*, 442 U.S. 256, 279, 99 S.Ct. 2282, 60 L.Ed.2d 870 (1979). *Accord Day v. Patapsco & Back Rivers R.R. Co.*, 504 F.Supp. 1301, 1310 (D.Md.1981).

72. *Day*, 504 F.Supp. at 1310.

73. *See International Bhd. of Teamsters v. United States*, 431 U.S. 324, 355–56, 97 S.Ct.

1843, 52 L.Ed.2d 396 (1977) ("The seniority system in this litigation is entirely bona fide. It applies equally to all racial and ethnic groups. To the extent that it 'locks' employees into non-line-driver jobs, it does so for all.").

74. *See American Tobacco Co.*, 456 U.S. at 75, 102 S.Ct. 1534.

75. *Cf. United Air Lines v. Evans*, 431 U.S. 553, 558–60, 97 S.Ct. 1885, 52 L.Ed.2d 571 (1977).

tory intent. Rather, the clear inference from the Complaint is that, following Bank of America's acquisition of Merrill Lynch, defendants established the ATP in an effort to retain Merrill Lynch FA's.

## V. CONCLUSION

For the reasons set forth above, defendants' motion is granted and plaintiff's claims challenging the ATP are dismissed with leave to replead. While plaintiff is granted leave to replead, the Court views with great skepticism plaintiff's ability to sufficiently allege that the ATP was adopted to intentionally discriminate against female FA's. Therefore, before repleading, plaintiff should carefully consider whether she can allege additional facts that would make her claims plausible rather than possible, keeping in mind the requirements of—and the sanctions authorized by—Rule 11. If plaintiff decides to file a Second Amended Complaint, it must be done within twenty (20) days of this Opinion and Order. The Clerk of the Court is directed to close this motion (docket # 22).

SO ORDERED.