**Willis L. GANTLIN, Alponse Gailliard, George Chatman, Clifford Graham, Charles Jenkins, Christopher Jenkins, each individually and on behalf of all other persons similarly situated, Appellants,**

v.

**WEST VIRGINIA PULP AND PAPER COMPANY, a corp., also known as Westvaco Corp., International Brotherhood of Pulp, Sulphite and Paper Mill Workers, AFL–CIO, an unincorporated association, Local No. 508, International Brotherhood of Pulp, Sulphite and Paper Mill Workers, AFL–CIO, an unincorporated association, United Papermakers and Paperworkers, AFL–CIO, an unincorporated association, Local No. 435, United Papermakers and Paperworkers, AFL–CIO, an unincorporated association, International Brotherhood of Electrical Workers, AFL–CIO, an unincorporated association, Local No. 1753, International Brotherhood of Electrical Workers, AFL–CIO, an unincorporated association, Appellees.**

No. 81–2150.

United States Court of Appeals, Fourth Circuit.

Argued July 11, 1983.

Decided May 10, 1984.

Morris J. Baller, San Francisco, Cal. (Jack Greenberg, O. Peter Sherwood, Gail J. Wright, New York City, Arthur McFarland, Charleston, S.C., on brief), for appellants.

Hill B. Wellford, Jr., Richmond, Va. (Thomas J. Manley, Hunton & Williams, Richmond, Va., Leonard Appel, Woods, Villalon, Hollengreen & Appel, Washington, D.C., Harris Jacobs, Jacobs & Langford, Atlanta, Ga., on brief), for appellees.

Before PHILLIPS, SPROUSE and ERVIN, Circuit Judges.

JAMES DICKSON PHILLIPS, Circuit Judge:

Appellants, representing a class of black paper mill employees in Charleston, South Carolina, appeal from the district court's dismissal of their action brought against their employer and several labor unions under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, and Section 1981 of the Civil Rights Act of 1866, 42 U.S.C. § 1981. On this appeal they contend that the seniority system contained in the collective bargaining agreement reached between Westvaco, their employer, and the United Papermakers & Paperworkers/International Brotherhood of Pulp Sulphite and Paper Mill Workers (UPP/IBPS), their exclusive bargaining representative, unlawfully disadvantaged black employees by effectively confining them to the lowest-paying and least desirable jobs. They argue that the seniority system is not "bona fide" and therefore falls outside the protective scope of § 703(h) of the Act. Appellants also maintain that the district court improperly allocated to them the burden of persuading the fact-finder that the seniority system was not bona fide. Because we conclude that the district court's factual findings were not clearly erroneous, we affirm.

I

A.

After fulfilling jurisdictional prerequisites,[1] appellants filed this lawsuit on June

1. Appellants contend that they filed charges with the EEOC as early as August 4, 1966. The district court concluded that the first charge was filed on April 25, 1967. On March 11, 1969,

15, 1972. They alleged that black employees at Westvaco's North Charleston paper mill were discriminated against in hiring, promotion and in the operation of the seniority system; the complaint sought relief on behalf of a class of present and past black Westvaco employees. On March 14, 1973, the district court certified the case as a class action under Fed.R.Civ.P. 23. Because the court concluded that the named plaintiffs were not proper representatives of job applicants or of non-bargaining unit or salaried employees, it defined the class more narrowly than the plaintiffs sought, namely as:

> All black persons employed in bargaining unit jobs at Westvaco's North Charleston Paper Mill between July 2, 1965 [effective date of Title VII] and March 14, 1973 [date of certification].

The district court ordered that the trial be conducted in two phases. The first stage, set to begin on July 17, 1974, was limited to determination of appellees' liability to the class; a second stage, if needed, was to determine individual relief. Just prior to the commencement of the first phase of the trial proceedings, the parties entered into a lengthy stipulation.

At the trial, which lasted from July 17 to August 15, 1974, appellants advanced three primary theories of recovery: (1) that appellees discriminated against blacks who requested transfer to production and maintenance positions;[2] (2) that appellees discriminated against blacks in the selection of apprentices for maintenance department jobs; and (3) that Westvaco's seniority system operated in a racially discriminatory fashion and was not bona fide because it perpetuated pre-Act racial discrimination and was not justified by business necessity.

Following the conclusion of trial, the parties agreed to wait until the trial transcript was completed before submitting briefs and proposed findings. Due to unfortunate and extraordinary circumstances the transcript was not ready until June 1, 1978. During the hiatus caused by the transcript delay, the Supreme Court decided *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977), which, in holding that a seniority system's perpetuation of pre-Act discrimination did not without more render it non-bona fide, shed a new light on appellants' theories advanced at trial.

Although the district court reopened the record in 1978 to allow further submissions relating to the operation of the seniority system, appellants offered none. Following briefing, oral argument and the submission of proposed findings in 1979 and 1980, the district court rendered its decision in October of 1981, finding in favor of defendants on all of appellants' claims. On this appeal, appellants have focused their attack on the district court's findings relating to the operation of the Westvaco seniority system,[3] and it is to that that we now turn.

**B.**

The organization of Westvaco's North Charleston Paper Mill is similar to that of

---

the NAACP Legal Defense Fund filed supplemental charges of discrimination with both the EEOC and the Office of Federal Contract Compliance (OFCC). Later that year, the EEOC, following a "reasonable cause" finding, advised the parties that it would undertake conciliation efforts. In May 1970, the EEOC and the OFCC agreed to coordinate their conciliation activities and, thereafter, the OFCC took primary responsibility for conciliation. A settlement agreement was reached in November of 1970. The district court rejected appellees' contention that the settlement agreement barred this action.

**2.** The parties stipulated that initial job placement into production jobs occurred on a racial-

ly nondiscriminatory basis after May 8, 1968, but disagreed as to placement from 1965 to that time.

**3.** In a footnote in their brief, appellants assign as error the district court's determination that there was no discrimination in hiring and initial assignment to production jobs from 1965 to 1968. Because we conclude that the district court's findings in this regard were not clearly erroneous, we reject this argument.

other paper mills in the United States. To facilitate its production of kraft paper, pulp, and chemical by-products, the mill is divided into different areas of operation.[4] These areas of operation, or departments, are functionally related and provide complementary contributions towards the final products. Each of the mill's production departments consists of various lines of progression or sequences. These "units," presently structured primarily in order of wage rates, comprise the ladder of promotional opportunity at the mill. An employee promoted within a particular production department progresses from his current step in the line of progression to the next higher step, and so on; these lines also provide the descension steps for an employee who is demoted.[5] In addition to the production departments, the mill has maintenance departments, which, as the name suggests, are responsible for maintaining the operating equipment at the mill. Workers in the maintenance and production departments, totalling 1049 at the time of trial (222 black, 827 white), are represented by labor unions. Because maintenance and production employees are employed in the "bargaining-unit jobs," they are of primary concern in this class action.

### C.

Before describing the precise nature of the Westvaco seniority system at issue, it is necessary briefly to examine the historical context out of which it arose. One significant historical element was the collective bargaining relationship between Westvaco and the labor unions who are appellees here.[6] In 1937, the year in which the plant became operational, the Interna-

---

**4.** As noted in the district court's opinion, *Gantlin v. Westvaco Corp.*, 526 F.Supp. 1356, 1360–61 (D.S.C.1981), the mill is divided into the following departments:

*Woodyard-Operating*
  Reception center for wood supply in various forms. Converts roundwood into chips and mixes with purchased chips to supply pulp mill. Conveys bark and reject wood particles to supply the power boiler.
*Woodyard-Service*
  Mill-wide clean-up, maintenance of grounds, and general service.
*Pulp Mill*
  Takes wood chips from woodyard and processes into chemical pulp. Washes spent chemicals from pulp for recovery, and processes pulp for use in paper mill.
*Recovery*
  Reclaims chemicals from spent pulping liquor and makes new cooking chemicals. Produces steam from burning organic waste.
*Paper Mill*
  Receives virgin kraft pulp and self-generated waste and converts these into finished unbleached kraft liner-board and paper grades in roll form.
*Technical Services*
  Specification testing of paper and linerboard.
*Water Treating*
  Produces treated water for power and recovery boiler. Tests and regulates boiler water and treated liquid effluent of the entire mill.
*Finishing and Shipping*
  Prepares for shipment, loads and ships finished products, and maintains customer inventory.
*Converting*
  The Baler is the only portion of the converting progression in use. Its function is the mechanical baling of fluff-dried pulp.
*Power*
  Produces electricity and is responsible for water supply to support all production facilities.
*Tall Oil*
  Refines crude tall oil and converts to useful products for various industries.
*Polychemicals*
  Extracts lignin from black liquor and converts to useful products for various industries.
*Receiving and Stores*
  Receives, stores, and disburses parts and materials.

**5.** The "Tall Oil" Progression, for example, is structured in the following manner:

TALL OIL PROGRESSION
First Operator
Second Operator
Third Operator
Crude Plant Operator
Fourth Operator
Shipping and Receiving Man
Extra Man
Platform Man
Poolman

**6.** Appellees include the United Papermakers and Paperworkers International Union and its Locals No. 508 and 435; and the International Brotherhood of Electrical Workers and its Local No. 1753. Previous union defendants, the International Association of Machinists and its Lodge 183, were dismissed as parties to this appeal.

tional Brotherhood of Electrical Workers (IBPS) was certified as the exclusive bargaining representative for electricians at the mill. Seven years later, the United Papermakers and Paperworkers (UPP) and the International Brotherhood of Pulp, Sulphite and Paper Mill Workers (IBPS) [7] were jointly certified to represent mill employees. It is the seniority system negotiated by IBPS and UPP that is challenged in this case.

Shortly after IBPS and UPP were certified, they chartered locals at the mill; IBPS chartered Local 508 and UPP chartered Local 436. Later in 1944, in response to a request from black employees at the mill, IBPS chartered Local 508A. Comprised of black members, Local 508A later became Local 620.

When the mill first began operation, black and white employees had separate, segregated jobs and lines of progression. Without question, blacks were assigned inferior jobs, generally characterized by relatively low wage rates and calling for unskilled labor. The black local, Local 620, had jurisdiction over workers in these unskilled lines of progression, while the white locals, Locals 508 and 435, had jurisdiction over the skilled jobs performed exclusively by white employees. All three locals, however, bargained together and negotiated one collective bargaining agreement. Because of this practice, one seniority system existed for black and white employees represented by these unions.

In December 1963, the strictly segregated progression sequences formally broke down, as some whites were placed or transferred into formerly black (620) jobs and some blacks were placed or transferred into formerly white (508/435) jobs. Nevertheless, the predominantly black Local 620 maintained its jurisdiction over the un-

skilled lines of progression, and Locals 508 and 435 retained authority over workers in the skilled sequences.

In May 1968, the unskilled lines of progression, whose workers were represented by Local 620, merged into a single line of progression represented by Locals 508 and 435. The charter of Local 620 was revoked, and its members were absorbed into Local 508.[8]

### D.

The seniority system negotiated by UPP/IBPS through Locals 620, 508 and 435 is not unlike systems adopted by other companies in the same industry in the United States and Canada. The collective bargaining agreement outlined three types of seniority: job seniority, department seniority, and mill seniority. Job seniority accrued when an employee commenced a particular job; department seniority reflected an employee's length of employment in a particular department; and mill seniority was based on the total length of employment at the North Charleston mill.[9] As an employee left a particular job or department and moved to another job or department, he or she began to accrue job or department seniority based on time spent at the new position. The employee did not retain previous job or department seniority. Thus, if an individual employed as a Scaleman in the Finishing and Shipping progression was promoted to the job of Head Finisher, he did not retain job seniority based on time spent in the Scaleman position, but was required to accrue job seniority in his new job of Head Finisher. Similarly, if an employee transferred from one production department to another, he did not keep his previous department seniority; rather, it accrued from his first day in the new department.

7. These unions merged in 1972 to form the United Papermakers and Paperworkers International Union.

8. Although Local 620 approved the merger of the lines of progression, it initially voiced objection to the plan because of the existence of so-called "run-around rights," *see infra,* and the

date used to establish seniority for employees in the merged sequences.

9. Successful completion of a ninety-day probationary period was required of employees. Upon expiration of this period, seniority began as of the day the employee commenced work.

Job seniority governed promotion and demotion within an employee's line of progression, provided the employee had the "ability and necessary qualifications to do the job satisfactorily." Thus, if the work force were reduced, employees were demoted according to job seniority down the line of progression until the bottom or entry-level position was reached. Department seniority acted as a tie-breaker for employees with the same job seniority, and applied to layoffs from the department. Mill seniority governed lay-offs from the plant and transfers between departments. Departmental transfers, which could occur at either the employer's or the employee's request, were permitted only to the lowest or entry-level job in the sequence taken in the new department.

The seniority consequences of transferring from one production department to another differed depending on whether the transfer was requested by the employer or the employee. Although some departmental seniority was retained in the event of an employer-requested transfer, none was kept if the employee initiated the transfer. Transfers between lines of progression within the same department differed from transfers between departments. At all times at issue in this case, an intra-departmental transfer from one sequence to another did not entail a loss of departmental seniority.

E.

The operation of the seniority system at Westvaco, of crucial importance in assessing its bona fide or non-bona fide nature, is best examined at the points of time which mark changes in the system. The three critical events in the system's operation are the abandonment of formal segregation in 1964, the merger of sequences in 1968, and the implementation of mill seniority in 1970.

As noted earlier, prior to 1964 Westvaco maintained segregated lines of progression

for black and white employees. Blacks, employed in menial and unskilled jobs, were promoted and demoted within their own sequences, and whites, who enjoyed better, more rewarding jobs, occupied separate lines of progression. Within a given production department, therefore, the mill maintained black sequences (represented by Local 620) and white sequences (represented by Locals 508/435). A black employee who reached the top position in his sequence could not move into a non-620 sequence, nor could any black employee transfer into a non-620 sequence, even to an entry-level position.

Beginning in 1964, Westvaco ended the strict segregation of the promotional sequences. From 1964 until the Merger Agreement in 1968, Westvaco permitted blacks and whites to transfer from the unskilled to skilled sequences and vice-versa. The dual sequences, however, remained. Local 620 retained its jurisdiction over the former all-black sequences, and Locals 508 and 435 continued to represent workers in the jobs that were formally comprised exclusively of white employees.

A significant number of blacks were assigned or transferred to the jobs represented by Locals 508 and 435 in the period between the enactment of Title VII and the merger of the sequences in 1968.[10] The district court found that blacks were encouraged by Westvaco management to transfer to the skilled sequences during this time, and that incumbent employees who desired to transfer were given preference over new applicants for the positions. Significantly, the district court found, and was not clearly erroneous in its finding, that there was no discrimination in the placement or subsequent assignment of blacks after 1964.

Despite these trends, the dual promotional sequences demarcated by the Local 620 and 508/435 lines remained largely segregated by race. As the parties stipulated:

---

**10.** The parties stipulated that forty black employees transferred or were initially placed into

non-620 jobs during this period.

Notwithstanding Westvaco's placement of whites in 620 jobs and blacks in non-620 jobs during the period stated above, the sequences represented by 620, except the Long Log sequence, remained composed predominantly of black employees and the sequences represented by Locals 508, 435 and 1753 (IBEW), except for the Woodscaler sequence, remained composed predominantly of white employees, prior to the Merger.

The district court further concluded, however, that racial considerations did not influence the grouping of the 620 dual promotional sequences. The court found that the separation of the two lines of progression was necessitated by functional differences of the jobs within the groupings. Because the jobs represented in the 620 sequence were largely unskilled, the district court found that there were business reasons for failing to include them in the skilled non-620 sequences.

Without question, the Westvaco seniority system, operating from 1964 to 1968, perpetuated the effects of racial discrimination practiced by the company before the enactment of Title VII. Although the mill allowed black and white employees to transfer between sequences in the post-Act period, black employees, previously relegated exclusively to less desirable jobs, lagged behind white employees who had entered the mill work force contemporaneously with them. Nevertheless, the district court expressly found that appellees did not discriminate on the basis of race in job assignment, promotion or transfer following 1964, and that blacks and whites were able to transfer freely between sequences and departments after that time.

The next significant point of time in assessing the operation of the seniority system extends from 1968, when the sequences were merged, to the end of the actionable period in 1973. Of primary importance in this span was the adoption of the so-called Memorandum of Understanding in 1970, which resulted in a form of mill seniority system for many black employees.

On May 8, 1968, each of the locals at the Westvaco mill, along with Westvaco, signed a document known as "Memorandum of Agreement, Merger of Lines of Progression," which resulted in the merger of jobs formerly designated as the 620 sequence, with the non-620 lines of progression. This merger ended the dual sequences that characterized the seniority system up to that time, thereby allowing promotion from a "620 job" to a "508 job" without the necessity of a transfer. The merger basically affected six production departments.[11] In these departments the jobs formerly in the 620 sequence were placed or slotted into either the 508 or 435 sequences. The "slotting" was based on two factors: the nature of the job and the wage rate of the position. Lower-paying jobs were placed at the bottom of the newly merged promotional sequence.

Because the jobs in the former 620 sequence were unskilled and lower paying, they were generally slotted below the 508/435 jobs in the new lines of progression within the production departments.[12] Since blacks were primarily employed in 620 jobs both prior to and after 1964, they were generally placed at the lower steps of the seniority ladder following the 1968 merger.

The district court concluded that racial bias did not influence the structuring of the new sequences within each department. Rather, it found that "[j]obs within each

11. The production departments directly affected by the merger were: Woodyard, Recovery, Tall Oil, Polychemicals, Finishing and Shipping, and the Labor Pool. No other department had separate sequences represented by Local 620.

12. In the Recovery, Tall Oil and Polychemical departments, the merger resulted in the placement of all former 620 jobs below 508/435 jobs.

In the Woodyard Department, one former 620 position was placed parallel to a former 508 job, while in the Finishing and Shipping department, the former 620 job of Car Bracer was slotted ahead of the former 435 jobs of Roll Finisher and Senior Roll Finisher. Push-up and recall rights affected this seniority structure following the merger.

line are functionally arranged in a manner which recognizes the skill and complexity of the positions and which provides the essential on-the-job training needed for successful performance." 526 F.Supp. at 1372. Noting that "there was no other way that the sequences could have been restructured" to accomplish the merger's objectives, the court concluded that "the effect of the merger was to give persons in the 620 jobs an immediate avenue to higher positions without the necessity of transferring sequences." *Id.*

Consideration of the operation of the seniority system after 1968 is not complete without a discussion of so-called "run-around" provisions, which survived the merger agreement. These provisions were of two types—"push-up" and "recall" rights. Mill employees enjoyed "push-up" rights "at all relevant times" since mill operations began. Certain employees, based on job seniority, were given the right to "push up" to the next highest job in their sequence whenever a temporary vacancy was created, either by another employee's vacation or for another reason.[13] This system was used as a primary training technique by the company. By pushing up, the employee became next in line to fill that permanent position, even if prevailing seniority rules dictated otherwise.

The existence of these push-up rights delayed the full implementation of the seniority system created by the merger. In the few areas where 620 jobs were placed above non-620 jobs, some employees in the non-620 jobs were able to promote ahead of former 620 employees. The "push-up" rights, therefore, enabled these 508 employees to "run-around" the now senior 620 employees.[14]

"Recall rights" had a similar effect. According to a longstanding policy, employees who were involuntarily demoted from a position retained the right to be promoted to that position in the event of a future vacancy, regardless of the result dictated by job seniority rules. Employees who had acquired these "rights" were able to jump ahead of employees slated above them in the newly structured lines of progression. The merger agreement did not purport to affect either of these practices.

At the urging of the Office of Federal Contract Compliance and the EEOC, the unions and Westvaco reached an agreement in 1970 that altered the seniority system adopted in 1968.[15] Under this Memorandum of Understanding, which was ratified in November of 1970, black employees in the "affected class"[16] were able to compete with white employees for promotion to the "next highest classification" on the basis of mill seniority. This provision enabled some blacks to promote around whites with greater job seniority. *See* 526 F.Supp. at 1380. The 1970 Memorandum, like the Merger Agreement, did not discuss "run-around" rights, and the company continued to recognize these rights after the adoption of the Memorandum. By the time of trial, however, the push-up rule had exhausted itself, and the company and unions no longer recognized recall rights. *Id.*

### F.

The district court made extensive findings of fact and conclusions of law and, in

---

**13.** An employee who "pushed up" received the rate of pay for the new job, and the failure to push up delayed an employee's promotional opportunities. Both temporary push ups, in which employees filled in on their existing shifts, and regular push ups, in which employees filled in on a long-term basis, were utilized by the company.

**14.** Because both blacks and whites were able to transfer between sequences in the post-Act period, some blacks were theoretically able to utilize push-up rights in 508 jobs. White employees, however, who comprised the vast majority

of non-620 employees, were the primary beneficiaries of push-up rights in the skilled lines of progression.

**15.** *See supra* note 1.

**16.** The "affected class" included minority employees hired prior to May 8, 1968, into 620 jobs; minority employees hired after the merger and placed into "jobs from which there was little upgrading movement" and minority employees presently in job classifications in which minority group employees constituted more than 50% of the incumbents.

its lengthy memorandum opinion, rejected each of appellants' claims. It concluded that the disparate impact caused by the seniority practices at the mill was not actionable because the negotiated seniority system was bona fide and not a result of an intention to discriminate.

The district court's analysis of the challenged seniority system proceeded according to the analysis suggested in *James v. Stockham Valves & Fittings Co.*, 559 F.2d 310, 350–53 (5th Cir.1977), *cert. denied*, 434 U.S. 1034, 98 S.Ct. 767, 54 L.Ed.2d 781 (1978). The areas of inquiry focused on by the court included:

> (1) whether the seniority system operates to discourage all employees equally from transferring between seniority units; (2) whether seniority units are in the same or separate bargaining units (if the latter, whether the structure is rational and in conformance with industry practice); (3) whether the seniority system had its genesis in racial discrimination; and (4) whether the system was negotiated, and has been maintained, free from any illegal purpose.

526 F.Supp. at 1373. The court found that the seniority system at issue arose out of an agreement that was bargained for by a unit representing both black and white employees, and that the system was not at all unique in the paper industry. It concluded that the seniority rules were facially neutral and applied both on their face and in practice to black and white employees in the same manner—the consequences of transfer, the method of promotion, etc. were the same for blacks and whites. The court found no evidence that the seniority system was adopted with a racial purpose in mind; it noted that the mere fact that a system was adopted at a time when segregation was prevalent did not mean that the policy had "its genesis in racial discrimination." *Id.* at 1374. Most important, the court concluded that the primary reasons that black employees received a disproportionate share of the best jobs were that Westvaco had discriminated against blacks before the enactment of Title VII, and that, as a result of previous societal discrimination black employees were generally not as qualified for the better-paying jobs.

The court also found that the maintenance of dual lines of progression before 1968 and the slotting of positions after the merger were done for business, not racial reasons. *Id.* at 1372. It rejected the claim that run-around rights were adopted in order to disadvantage blacks, and concluded that valid business considerations prompted protection of these "vested contract rights." *Id.* at 1389.

## II

Section 703(a) of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–2(a), makes it an unlawful practice to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of, *inter alia*, such individual's race. "Bona fide" seniority systems, however, are carved out from this general proscription. Section 703(h) of Title VII provides:

> Notwithstanding any other provision of this subchapter, it shall not be an unlawful employment practice for an employer to apply different standards of compensation, or different terms, conditions, or privileges of employment pursuant to a bona fide seniority or merit system ... provided that such differences are not the result of an intention to discriminate because of race, color, religion, sex, or national origin....

42 U.S.C. § 2000e–2(h).

In *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977), the Supreme Court held that an otherwise bona fide seniority system is not rendered invalid under Title VII simply because it may perpetuate pre-Act discrimination. The Court concluded that a contrary reading of § 703(h) would "pervert" the congressional purpose and "disembowel" the exception. *See id.* at 353, 97 S.Ct. at 1863. *Teamsters* did not define "bona fide," but it did note several factors relevant to its conclusion

about the seniority system at issue in that case. The Court pointed out that the system applied equally to all races, that the placing of line driver in a separate bargaining unit was rational and in accord with NLRB precedents, that the system did not have its genesis in racial discrimination, and that it was negotiated and had been maintained free from any illegal purpose. *See id.* at 355–56, 97 S.Ct. at 1863–65. These factors have been treated by this court and others as a non-exclusive list to aid in the determination of whether a given seniority system is bona fide. *See Pullman-Standard v. Swint*, 456 U.S. 273, 279 n. 8, 102 S.Ct. 1781, 1785 n. 8, 72 L.Ed.2d 66 (1982); *Patterson v. American Tobacco Co.*, 634 F.2d 744, 748 (4th Cir.1980) (en banc), *rev'd on other grounds*, 456 U.S. 63, 102 S.Ct. 1534, 71 L.Ed.2d 748 (1982).

■ Subsequent cases have made it clear that an inquiry into whether a challenged seniority system is bona fide revolves around the presence of discriminatory motive or purpose. *See American Tobacco Co. v. Patterson*, 456 U.S. 63, 69, 102 S.Ct. 1534, 1537, 71 L.Ed.2d 748 (1982) ("To be cognizable, a claim that a seniority system has a discriminatory impact must be accompanied by proof of a discriminatory purpose."). "Absent a discriminatory purpose, the operation of a seniority system cannot be an unlawful employment practice even if the system has some discriminatory consequences." *Swint*, 456 U.S. at 277, 102 S.Ct. at 1784 (quoting *Trans World Airlines, Inc. v. Hardinson*, 432 U.S. 63, 82, 97 S.Ct. 2264, 2275, 53 L.Ed.2d 113 (1977)). This essential inquiry into motive is purely a factual one, and appellate review of a finding of the existence or nonexistence of such a motive is governed by the clearly erroneous standard set forth in Fed. R.Civ.P. 52(a). *See Swint*, 456 U.S. at 289–90, 102 S.Ct. at 1790–91.

The district court in this case found that the Westvaco seniority system was bona fide and therefore did not violate Title VII. As appellants acknowledge, we may upset that finding only if we conclude that it was clearly erroneous.

### III

Appellants challenge as clearly erroneous a number of subsidiary findings as well as the ultimate factual finding that the seniority system was bona fide. Primarily, they contend that when viewed under the proper legal standard, the operation of the system's transfer rules, its maintenance of dual lines of progression until 1968, the structuring of jobs following the 1968 merger, and the existence of run-around rights lead inexorably to the conclusion that the challenged seniority system was not bona fide. A "sensitive" appraisal of this evidence, they argue, reveals that the district court's ultimate factual finding was clearly erroneous.

■ First, appellants contend that the seniority system's transfer rules are not bona fide, but reflect intentional discrimination. Specifically, they argue that black employees, historically confined to lower-paying "620 jobs," were forced to commit "seniority suicide," *see James v. Stockham Valves & Fittings Co.*, 559 F.2d at 348, upon transfer from their jobs. The purpose behind these rules, they contend, was to keep blacks in lower-paying, unskilled jobs. In support of this argument, appellants note that upon transfer to a new department, employees lost both job and departmental seniority.

There is of course nothing inherently suspect about the operation of Westvaco's transfer rules or their effect upon an employee's seniority. The rules are facially neutral and affect black and white employees alike; the apparent effect of the rules is to discourage transfer by both blacks and whites. Moreover, the district court expressly found that the company imposed no barriers to transfer following 1964, and, in fact, actively encouraged such transfers by black employees. Although we agree that under some circumstances it is permissible to infer that a racially discriminatory motive exists if a seniority system's predominant effect is to confine blacks to low-

er-paying, menial jobs,[17] we do not agree that the district court was compelled to make that inference in this case.

Under the Westvaco seniority system, employees who transferred between departments did not lose their "mill seniority." Employees therefore were not forced to forfeit all accrued seniority upon transfer. *Cf. Teamsters*, 431 U.S. at 344, 97 S.Ct. at 1859 (transferring employee required to forfeit all competitive seniority). More importantly, employees did not lose their departmental seniority when they transferred to a different line of progression within the same department. Desirable jobs at the mill were not confined to traditionally white *departments*, but to the historically white lines of progression. Thus, a black employee was able to transfer to a skilled line of progression without losing either his retained mill or departmental seniority. Given these facts, we cannot conclude that the district court clearly erred in failing to draw the inference of discriminatory motive from the maintenance of these transfer rules.[18]

■ Appellants also claim that the maintenance of dual lines of progression from 1964 to 1968 was done for no other reason than to disadvantage blacks. They argue that the sole permissible inference from such a system was that the sequences were structured in such a way as to keep blacks in lower-paying, less skilled jobs. Blacks, who comprised the vast majority of those holding 620 jobs, were required to transfer to entry-level positions in the skilled sequence and, until transfer, were unable to push up in the skilled progression. Appellants emphasize that the dual promotional sequences represented by 620 jobs and 508/435 jobs tracked precisely the prior segregated sequences. They contend that the continuation of these separate ladders was arbitrary and done for racial reasons.

The district court concluded, however, that the maintenance of dual progression lines for this period was done for business, not racial reasons. As appellants acknowledge, these sequences comprised skilled and unskilled jobs. The district court found that the functional relationship between these jobs provided the reason for the dual structure. Since progression through unskilled jobs did not give an employee the necessary experience to promote into a skilled position, it was rational and not inappropriate to maintain separate promotional sequences within each department. We do not believe that such a conclusion was clearly erroneous.

■ Appellants also claim that the arrangement of jobs following the 1968 merger was activated by a racially discriminatory motive. As a result of the merger agreement, 620 positions were placed, almost without exception, below the 508/435 jobs in each department. One permissible inference from such an arrangement is that the appellees intended to put blacks, who primarily comprised 620 positions, at the bottom of the ladder, grossly behind their white co-workers with equal and less mill seniority. We reiterate, however, that such an inference is permissible, but not, on this record, compelled. The district court concluded that the arrangement of jobs was motivated not by racial considerations but by business reasons—the functional compatibility of the jobs. The court

17. *See United States v. Georgia Power Co.*, 634 F.2d 929, 935 (5th Cir.1981), *vacated, Local Union No. 84, International Brotherhood of Electrical Workers*, 456 U.S. 952, 102 S.Ct. 2026, 72 L.Ed.2d 477 (1982). *See also Swint*, 456 U.S. at 289, 102 S.Ct. at 1790 (disproportionate impact is relevant consideration in determining intent). As the Supreme Court pointed out in *Teamsters*, however, the fact that a seniority system operates to "freeze" minority employees in lower-paying jobs may simply be the result of an employer's discrimination before the enactment of Title VII.

18. Under Westvaco's seniority system, employees who moved into a new job, either by virtue of transfer or promotion, lost their previous job seniority and began accumulating job seniority within their new position. Because, as the district court found, the progression of positions within a sequence was functionally related, this forfeiture of retained job seniority was rational. As an employee accumulated job seniority in his new job, he became better prepared for the position to which he might be promoted.

found that the paper mill's production jobs were interrelated and that it was necessary to have employees work through certain jobs before moving on to other jobs. It concluded that the merger was a rational attempt to preserve this functional compatibility while at the same time giving black employees a way to promote within a skilled sequence without the necessity of first transferring. The fact that many more blacks found themselves at the bottom of the seniority ladder, the court found, was a result of pre-Act racial discrimination, not of post-Act racial motivation. Again, we cannot find this to be clearly erroneous.

■ Finally, appellants argue that the prevalence of run-around rights, which continued after the merger of sequences and after the adoption of the Memorandum of Understanding, indicated a motive to discriminate on the basis of race. They contend that push-up rights, enjoyed primarily by whites in skilled lines of progression, were used to stifle the promotion of blacks within the newly merged sequences. The parties stipulated, however, that pushing up was a primary training technique, and it was not clearly erroneous for the court to conclude that the continuation of this technique was done for those reasons. Similarly, appellants contend that recall rights existed in order to disadvantage blacks. It was not error, however, for the district court to conclude, as it did, that these rights were adopted to protect employees' reasonable expectations and in fair recognition of the rights given to previously demoted employees. *Cf. Alexander v. Aero Lodge 735, International Association of Machinists*, 565 F.2d 1364, 1376–78 (6th Cir.1977) (upholding use of similar rights), *cert. denied*, 436 U.S. 946, 98 S.Ct. 2849, 56 L.Ed.2d 787 (1978); *Carroll v. United*

*Steelworkers*, 498 F.Supp. 976, 989–90 (D.Md.) (same), *aff'd*, 639 F.2d 778 (4th Cir.1980) (unpublished).

The ultimate factual finding of bona fides is properly based on a consideration of the totality of circumstances behind the adoption and maintenance of a seniority system. *See Swint*, 456 U.S. at 279, 102 S.Ct. at 1785; *James*, 559 F.2d at 352. The district court's finding in this case took into account various affirmative action efforts on the part of the employer, the presence of blacks in 508/435 sequences after 1964, the absence of discrimination in job transfers, and the preference given incumbent employees over new hires.[19] We cannot on this record hold that the finding on the ultimate factual issue was clearly erroneous.

### IV

Appellants also contend that the district court erred in its allocation of the burden of persuasion. Specifically, appellants argue that the district court erroneously required them to prove by a preponderance of the evidence that the Westvaco seniority system was not bona fide. They maintain that Section 703(h) of the Act, which encompasses the exception for bona fide seniority systems, is an exception to remedial legislation and therefore should be narrowly confined by requiring defendants, at least where a disproportionate impact is shown, to prove that a seniority system is bona fide and thus outside the Act's proscriptions against unlawful employment practices. *Compare Swint v. Pullman-Standard*, 17 FEP Cases 730 (N.D.Ala. 1978) (burden to show bona fides on defendant), *rev'd on other grounds*, 624 F.2d 525 (5th Cir.1980), *rev'd on other grounds*, 456 U.S. 273, 102 S.Ct. 1781, 72 L.Ed.2d 66 (1982), *with Day v. Patapsco & Back Riv-*

---

**19.** At trial, and on this appeal, plaintiffs argue that appellee's maintenance of its seniority system was intentionally discriminatory as evidenced by concerted management efforts to suppress dissemination of the Memorandum of Understanding in 1970. The district court, after considering the evidence on this point, found the contention "to be totally without merit." It

concluded that the company did not suppress knowledge of the agreement. We do not believe that this finding constituted clear error.

Appellees have filed a motion to strike certain portions of appellants' reply brief, including a section relating to the suppression of the Memorandum of Understanding. We deny this motion.

*ers Railroad,* 504 F.Supp. 1301, 1308 (D.Md.1981) (burden to show lack of bona fides on plaintiff). *See also Teamsters, California Brewers, and Beyond: Seniority Systems and Allocation of the Burden of Proving Bona Fides,* 54 St. John's L.Rev. 706 (1980) (burden should be on plaintiff); *Comment, Employment Discrimination-Seniority Systems Under Title VII,* 62 N.C.L.Rev. 357 (1984) (ultimate burden to show racially discriminatory intent in adoption or maintenance of seniority system should be on plaintiff). *Cf. Jackson v. Seaboard Coast Line Railroad,* 678 F.2d 992 (11th Cir.1982) (§ 703(h) is affirmative defense which must be pleaded by defendant or waived); *American Tobacco Co. v. Patterson,* 456 U.S. at 86–87, 102 S.Ct. at 1546–1547 (Stevens, J., dissenting) (§ 703(h) is affirmative defense).

A decision on this issue, however, would not affect our resolution of this case and accordingly we express no view on it. Although we agree that a demonstrated error in the allocation of the burden of persuasion may subject factual findings to challenge as "clearly erroneous," we do not believe that clear error has been shown in this case. The district court did not explicitly state whether plaintiffs or defendants had the burden of proof on the bona fides issue. It did, however, indicate that its factual findings relating to the operation of the seniority system would not have differed depending on which party had the burden of proving bona fides or the lack thereof. The court noted:

> Careful examination of the record evidence in this case establishes without doubt that plaintiffs cannot prevail in their attack on the seniority system here involved and that defendants have amply demonstrated the bona fide nature of their system, thereby satisfying any burden of proof which defendants may have in this regard.

526 F.Supp. at 1388.

■■■■■ Our review of the fact-finding process under the clearly erroneous standard can properly take into account the proper cast of the burden of proof. *See Miller v. Mercy Hospital, Inc.,* 720 F.2d 356, 362 n. 7, 369 (4th Cir.1983). Where a district court indicates, as here, that its formal findings would be the same without regard to the cast of the burden of persuasion, we must affirm those findings if, assessing them under either cast, we would uphold them as not clearly erroneous. Here, under either cast of the burden, we would uphold the findings. On that basis, remand is not justified either to require the district court to determine the proper cast, or to assess the evidence under the proper cast as directed by this court.[20]

AFFIRMED.

---

**20.** By this we do not approve, as a general practice, the avoidance by bench trial judges of decision on potentially critical questions of the proper cast of proof burdens. Where the question is an open one and the dispositive factual issues close, the trial judge should ordinarily address the burden of proof question head-on and record his decision, certainly where it is raised by a party and, possibly, *sua sponte.* By this means the fact-finding process is consciously guided, appellate review is facilitated, and the development of needed precedent is made possible. Where decision is not consciously made or, if made, not recorded, appellate review, though not forestalled, is made more difficult by being forced into an unguided and potentially uninstructive assessment under both alternatives.

Of course if review discloses that under the proper cast of the proof burden (as determined first instance by the reviewing court) the fact findings are clearly erroneous, reversal or remand must follow, though the specific basis of the error remains unclear.

Though the general practice is not approved, remand here on that basis alone would be wasteful formalism in view of our conclusion that the critical findings withstand clearly erroneous review under either cast of the burden.